Hi, Orbán. Hi, Mr. Goldberg. Thank you, Your Honor. May it please the Court, my name is Dan Goldberg, and I represent Ryan Luscombe in this appeal. The Sixth Amendment to the Constitution enshrines two dueling constitutional rights. One, the right to adequate representation, and second, the right to proceed with a say. The District Court erred here because it failed to protect neither of these rights. But to give this Court a roadmap of where I intend to head first, I'd like to address the revocation of his right to proceed pro se. On day three of the trial, a judge told Mr. Luscombe to sit down and terminated his Sixth Amendment right to proceed pro se, but never really explained why then. And I think why that's troubling is because this Court's case law has held that you have a right to represent yourself unless you engage in, quote, seriously obstructive conduct. And that's from the Smith case from this Court. Counsel, what's our standard view on that particular issue? I think it's a great question, Your Honor. I think it's de novo. The government argues that it may be plain error. I'm not seeing how we get to plain error analysis because as it pertains to the revocation of his right to proceed pro se, the judge repeatedly asks, do you want standby counsel? And he repeatedly, respectfully says, no, you don't. And so plain error, I think, is reserved for issues where it's not teed up for the Court and the Court doesn't have a chance to review the issue. That's not the case. Now, standby counsel did not lodge a proper objection following the decision of the District Court here. Is that correct? I think that's correct. But I don't think she needed to at that point because Mr. Luscombe was very clear in his representation. And if you look at the transcript, when he was told to sit down, I think it would have been seriously disrespectful for him to jump up and object again. And I think circuit court case law throughout the nation really holds that we don't expect pro se litigants to make that last objection. This is structural error. And so even if this Court were to analyze it as plain error, I think it would rise to that level. But I don't think we need to go there as it pertains to the termination of his right to proceed pro se. The question, I think, becomes, did he engage in seriously obstructive conduct? And the Smith case, I think, is a really well-reasoned decision by Judge Loken. And he explains that the District Court must tolerate numerous nonsensical pleadings, even occasionally wacky behavior, so long as the defendant is not disruptive or defiant. Judge Loken then goes on to explain what does not rise to that level, and that's even repeated frivolous challenges to the Court's jurisdiction or the validity of United States laws. That doesn't rise to that level. I mean, here, wasn't it repeated refusals to follow the Court's instructions? I mean, I can understand how that might, for a District Court judge trying to handle a trial, there were direct orders given to him, and he repeatedly failed to follow the Court's specific directions. And I think it could be viewed that way, but it's the directives to be adequate counsel. And he was not very good at it. Cross-examining witnesses is tough, right? I think even seasoned litigators go to seminars to learn how to cross-examine witnesses. And I think that was really what the directives were at when you look at the transcripts. You know, don't interrupt witnesses. Even seasoned litigators have a hard time at that. So he's trying to do the best he can, and he's listening to them. The judge is saying, well, do it this way. You know, don't interrupt. Shorter, more concise. He repeats that. He says, more concise, shorter. And so it's almost kind of like a moot court, where the judge is saying, you know, do better, do better. And he's saying, I'm trying. I'm going to listen. You know, and I think throughout these proceedings, it doesn't rise to that level because he's respectful to the judge, calls her Your Honor, stops when instructed. So I just don't think that the government's point in any cases where cross-examination questions rises to that level of seriously obstructive conduct. So, well, so what is the argument you're making right now? Are you saying, you're arguing that the court erred in terminating his right, his self-representation on day three? That sounds like the argument you're making. Yes, Your Honor. But I thought your principal argument was that the court erred by waiting until day three to terminate his self-representation. I think it's a fair observation, Your Honor, the way we set forth our brief. And then the second question is, in one appeal, how can you make both arguments? I mean, I understand the concept of alternative grounds for reversal, but that's a no-win for the district judge. He can't. He errs both ways under this scenario that you're presenting here. I think it's a valid concern. So what is it? Which is it? Which are you asserting? Let me address your first question. As far as the arguments, you're correct. The first argument we raise in our brief is the adequate representation argument. We do that because there's a chronological flow to the argument. I think the primary argument that we're advancing is the revocation of his right to go pro sec. And I think that is the primary error here. I think the case law here is unambiguous. It's a structural error. It's preserved. It mandates a new trial. Full stop. I don't think you have to get to the adequate representation claim. Because that's such a weighty concern. Now, to your second question, Judge, I think you make a good point. Well, he makes two different arguments. But he has two constitutional rights. And there's, I think, a tension inherently in the Sixth Amendment. And I think what the district court erred here was it chose a no-man's land where neither of those rights were honored. And I think that's troubling. I think when you look at this court's case law, it falls in one of two camps. One, you're not allowed to represent yourself because you're seriously obstructionist. And that's at the very beginning of trial. Or you're allowed to represent yourself and you're allowed to go throughout the entire trial. That's not what happened here. The judge interrupted him on day three. Ten witnesses had already testified. Thirty exhibits had already come into evidence. And she said, sit down, and never really explained why. And I think that's troubling. And I think it's the government's argument that there's a real tension. They say that he's both seriously obstructionist and he had a right to proceed. And I don't think it can be either. If either of those things is true, then I think he's entitled to a new trial because he has that Sixth Amendment right. Well, counsel, as to the first issue, what would have caused the district court to question the defendant's mental competence from the start? Judge, I think that's a fair observation. I think that if any issue were to be raised or reviewed for plain error, it would be that one. And I do think that's a secondary claim because I think this court's case law has observed that, you know, typically it's not the judge's duty to sui sponte, issue that type of order. I think the stronger part of that claim is that, and I don't think the government disputes this, that Ryan Luskum is the same attorney throughout that trial. Okay? So day one of the trial, opening statements start, and he, you know, makes these arguments that he does. And then he tries to cross-examine Agent Schlum. And repeatedly he's admonished by the court. Do it this way. Do it that way. It's all in front of the jury, which is also pretty troubling. Counsel, I might agree with you that bad cross-examination skills would not be enough to suspend his right to self-representation. But don't we have to look to the totality of his conduct, including the threatening e-mail? I think you should look at it absolutely. I think the reason why it's not a reason to terminate his pro se rights here is that, first, the district court never makes that nexus. She never says, well, you had this e-mail. And it seems like the e-mail, you know, his bond revocation didn't occur until after his six-minute rights were violated. So I don't know if that e-mail had any role whatsoever. In this court's case, in the Smith case, Judge Loken does a good job of saying, well, terminating your right to go pro se is much more serious than terminating bond rights. So she could have cut his wings on bond and still honored his right to six-minute representation, because I think his conduct in the court was always respectful. It was always your honor. When he was told to sit down, he did. When he was told to be quiet or, you know, whatever, I think you see him really trying to endeavor the best he can to represent himself. What I'd like to do, if there's no other questions on Issue 1, is just briefly turn to Issue 2, because I think that is a weighty issue as well as to whether or not Mr. Luskom's sentence is substantially reasonable. He was, of course, sentenced to 180 months. That was approximately seven years above the low end of his guidelines range. Of course, the district court was entitled to sentence him to that sentence if the 355-3 factors supported such a significant variance. But I think what you see when you look at his guidelines range, the base offense level is seven, and it jumped to 28 based on the aggravating circumstances, like the extent of the fraud. The other factors the judge is considering have already been calculated into his guidelines range. As it pertains to his criminal conduct, and I think that's troubling because she's pointing to other factors, the judge is, like that he was disrespectful to his counsel, and I don't think that's a basis to significantly vary up. And the last point I'd make on that issue is that I think the government's argument for affirmance there is that this court should reject all the objective load stars to determine when a sentence is reasonable. We point to the guidelines. The government says disregard that. We point to mean and medium sentences. The government says that's irrelevant. I think there has to be some objective basis to evaluate the reasonableness of sentences, and the government really hasn't done that. Unless there's further questions, I'd like to reserve the remainder of my time for the follow-up. All right, thank you. Mr. Casey. I'm a police court, Brian Casey, on behalf of the United States. In this case, the district court did all it could to respect Mr. Luscombe's right to represent himself, but also maintain the integrity and efficiency of the trial. I think one of the things that is very important in this case is that Mr. Luscombe does not challenge that he knowingly and voluntarily waived his right to counsel. And that really sort of sets the stage for a lot of the following analysis. And the reason it does, and it goes to one of the court's questions already, is every standard of review case that Mr. Luscombe cited is whether or not are cases where the issue is whether or not the defendant knowingly and voluntarily waived his right to counsel. And the reason that those cases go to de novo review and the reason that some of those cases reject plain error review is they say, well, it wouldn't be fair to hold a pro se defendant to a standard of making an objection when the whole issue is whether or not they were adequately warned of the dangers of their self-representation. And so that analysis of knowingly and voluntarily involves the threat analysis of whether or not you were adequately warned. Once you're adequately warned, you're held to the standards of any other litigant. And in this case, they're not even challenging that he was adequately warned. And so this is not a knowingly and voluntarily waiver case. And so their law, Mr. Luscombe's law, when he cites about the standard of review, is irrelevant. In this case, the facts matter. The court's making a factual determination on whether his conduct is so disruptive that maintaining the integrity of the trial requires revoking his self-representation. Wasn't most of this just bad lawyering, though? When I'm reviewing the briefs here, failure to ask proper questions, asking compound questions, taking too long on cross-examination, aren't those the sorts of things that can be managed? There's actually two answers to your question, Your Honor. The first is no, it wasn't bad lawyering or just bad lawyering. So going all the way back to Ferretta, Ferretta talks about two ways in which someone could forfeit their self-representation. They could do it either through violating the rules of procedure or evidence, or they could do it by undermining the dignity of the courtroom. And in this case, he's doing both. So not only is it bad lawyering in terms of the types of questions, but also if you go through the questions themselves, he's trying to testify a lot. And a lot of his testimony is itself inadmissible evidence, such as inadmissible hearsay. And so he's undermining the integrity of the trial by undermining the integrity of the evidence. I mean, his whole purpose is through testifying and through talking over witnesses, through interrupting them to sort of interject his testimony, he's trying to affect the evidence in the case. And so that's why it's not sort of just poor lawyering. It really is going to sort of the integrity of the case. And then secondly, at some point even poor lawyering has to stop, right? And at some point it does affect the dignity of the courtroom. And if you look at just how often he's interrupting witnesses, just how often he's asking incomprehensible questions in incomprehensible ways, that starts to, you really start to see, even on a cold transcript, it doesn't even resemble a trial anymore. I mean, there are almost every page of some of his cross-examinations, and I think the one to look at would be the first cross-examination on the second day of Miss Dewey. Almost every page involves multiple interruptions, multiple sustained objections, multiple attempts by him to testify. And so at that point, we're past just poor lawyering at that point. At that point, we're talking about actually interrupting the trial process itself. Counsel, how would you address Mr. Goldberg's argument that we have to separate the threatening email situation from the other problems at trial? Well, I think that that kind of goes to the more fundamental issue about why this is plain error, actually. And this is plain error review because there was no contemporaneous objection. And the reason there was no contemporaneous objection is everyone sitting in that courtroom knew that his conduct was obstructive and that he had been given multiple last warnings and that when he finally talked over and tried to testify over witness one last time, when the district court said, okay, we're going to take a break, the district court then did exactly what she said she was going to do, take a recess, ask him to sit down, and direct standby counsel to step in. And so no one in that courtroom had a reason to object. They knew what was coming and they knew what was going to happen. And contrary to what Mr. Goldberg said, the district court actually asked Mr. Luskum at that point, asked him, do you have anything to add? And he said, no, Your Honor. So he was given an opportunity. Counsel was given an opportunity to make a contemporaneous objection. Mr. Luskum was given an opportunity to make a contemporaneous objection. And then even when the issue comes up later in trial, at no point is the objection that his conduct was not serious and obstructive. The objection was to a different federal related issue, that is, whether or not he has the ability to either represent himself or be appointed, whether he has counsel of his choice. And this court has decided that, that a trial court can make a defendant accept appointed counsel and that he does not have a right to represent himself or counsel of his choice. That's the only objection that was ever made. And so the reason there wasn't this fuller record about everything the district court was thinking was because the district court didn't have to make it. Everyone in the courtroom knew why his self-representation had been revoked. And so I do think we can look to the entire record to see now on plain error review where the burden is on the defendant, we can look to that entire record and see, okay, what if the district court had been asked what his reasons were? What would the district court have said? And I think it's very clear under this record that the district court was aware of the threatening emails and would have added that, including also the subpoenas that were served. Because I know in the briefing it says, well, the subpoenas happened before trial, but the subpoenas that really go to the issue here that were quashed in part because they were harassing, that motion to quash was filed the Sunday before trial on the 11th. On the 12th, the district court gives Mr. Luskum the opportunity to respond to that motion to quash. And on the 13th, because he didn't respond to it, then the subpoenas are quashed. So, again, the allegation that he filed harassing subpoenas happens during the trial as well. So I do think that those two things can also be taken apart of and viewed as part of the court's analysis. And just to be clear, the district court didn't revoke his representation because, merely because he was ineffective. I know this goes to Judge Kobus' earlier question, but there's just nothing in the record that supports that. What the district court's statements are, there are continually sustained objections, and he's continually told to stop when he's trying to violate the rules of evidence or the decorum of the court. And so these are the reasons in Feretta that a district court can revoke self-representation. And the reality in this case is that Mr. Luskum chose to revoke his self-representation. He was given the chance to conform his conduct. I know that in the briefing, and today Mr. Goldberg has mentioned that the district court, based on the Smith case, the district court could have taken smaller steps. There were smaller steps the court could have taken. And under this record, the court did take those ameliorative steps. The court spoke with him after his opening statement, explained, well, this is what you can do, this is what you can't do. The court then, on the second morning of trial, said, okay, Mr. Luskum, I gave you some leeway for the first witnesses because I kind of considered them professional witnesses. They were not technically law enforcement witnesses. One of them was a Department of Justice attorney, but more or less law enforcement witnesses. So now with these lay witnesses, I'm going to tell you, I'm going to pay more attention, and I'm going to kick a little tighter rein, and I think that was a fair thing a court could do, even with a struggling lawyer. This doesn't have to do with pro se. This is just simple management of a court's docket. But told him, if you continue to do what you were doing, we're going to take ameliorative steps. We're going to limit your cross. We're going to limit time. We're going to do all of these things to try to get us back on track. And that's what the court did over the next day and a half. The court started with sustaining a lot of objections on that first day with that first witness, Mr. Dewey, and then next went to, okay, I'm going to limit you to the amount of time on direct, which is a common court rule. It's not done specially in a pro se. This is, you know, most trial courts have this general rule. And still gave him, told him, I'll give you leeway if you're on a good topic, but I'm going to generally do that. And then the court started calling out time. The court started actually kind of enforcing it more. And then the court started limiting questions because this particular district judge has jury questions. Started limiting the amount of follow-up questions. And then ultimately to get the case back on track, got rid of jury questions entirely. You gave the jury the option. Would you like to have a longer trial day or would you like to just not do jury questions? And the jury said we'd rather have, you know, no jury questions. So the court was doing all of these smaller steps. The court was doing everything it could to preserve his right to represent himself. It's only at the point that he made it absolutely clear that he will not comport himself, he will not allow the court to preserve the integrity of this trial. He's going to continue to have this proceeding that doesn't really look like a trial anymore. But the court then, on his election, it was his choice to continue to violate the court's directives. The court then asked him to sit down. Do you think the district court made a sufficiently clear finding on serious and obstructionist conduct or do we have to remand for that determination? I don't think so, Your Honor. I think if there were any remand, as we say in our brief, that would be it. Part of the reason is what I said earlier, is that there wasn't an opportunity to, there wasn't a reason to because no one asked. No one said, well, Judge, why did you do it? But I think, secondly, the court's record is made throughout the entire trial. If you go through those three days of transcripts, the court is continually telling Mr. Luscombe what he's doing that's improper, why it's improper, how he can correct it himself, and then telling him if you don't correct it, this is what's going to happen. And so that record is made throughout the trial for us. And I don't think there would be any reason to remand. I think it's really quite clear. Just very quickly on the first issue, I think from the briefs to oral argument, I think Mr. Luscombe switched his argument. I think the primary argument was, just based on how much more time and effort was put into the briefing, the primary argument was that the court erred in allowing him to proceed pro se after that first day. I think the simple answer is there was nothing in this record to indicate that he suffered the type of severe mental illness that would give the court pause about his ability to be competent to represent himself. In fact, his behavior was quite cogent. It was quite rational. He was doing the things that he thought he needed to do to win. He was introducing the statements that he thought would be the statements that would help him win his trial. Now, he might have been wrong about that, but it showed that he understood the proceedings and he understood what was going on. I think an example of that you can see is in sort of as the briefs talk about a lot, his opening statement. Yes, he said some nutty things in his opening statement. But his opening statement also went, I believe the government's opening statement was around 11 transcript pages and his was around 18 or 19. It went significantly longer and the vast majority of it was him arguing about, well, what fraud is and why I was so open to these people that I could have not committed fraud. That's someone who understands what he's on trial for and that's someone who's understood what his case should be. So there's really no pause that the court should have had based on that opening statement. Instead, the opening statement showed what the rest of the trial showed. He was perfectly mentally competent to represent himself. He just, through his misconduct, chose to forfeit that right. If there's no other questions about the Fred issue, I just can very briefly address his sentence. And the, Mr. Luscombe said that the government has rejected any lodestar in this sentence. And that's entirely untrue. The government's lodestar in this sentence, and what it argues is brief, is the factors of section 3553A. And that was the court's lodestar in its sentencing. The court makes a very fulsome record at sentencing about why an upward variance was appropriate and does so in direct reference to the 3553A factors, including Mr. Luscombe's history and characteristics. What histories and characteristics did the court look at? His total lack of acceptance of responsibility and remorse. The court said this put him in the 99th percentile of defendants that this court had ever dealt with. And it really is, under these facts, outstanding that he's still standing there at sentencing, denying that he committed the crime. The court also looked to his attempt to blame it all on the death of his girlfriend, some tragic circumstance that he then tried to blame lying to his friends on and stealing their money. And the court looked at his other factors. This was direct recidivism. He left Minnesota and in the same year started up the same type of criminal scheme in Missouri. So then the court also looked at the nature of the offense and in particular looked at the particular harm. This was financial harm. Total loss was a million dollars. But some of the particular harm on some of the particular victims was really egregious. Some people were without homes because of it. And then the court looked at the need to deter Mr. Luscombe and to protect the public from him and cited those reasons in particular and given everything that was in front of this court was entirely reasonable in imposing a 180-month sentence. I see that my time has expired. If there are no further questions. Thank you, counsel. Mr. Goldberg, you have just over three minutes. Thank you, Your Honor. I think the government's arguments that Mr. Luscombe was engaged in seriously obstructive conduct rings hollow because the government could object it, right? They could have said, Your Honor, we need to revoke his right to go pro se. They never did so. Isn't that really the judge's responsibility to control the integrity of the overall trial? I mean, I think the judge has a certain ultimate responsibility. But if you look at the case law, the government is, in many of these, the moving party. And so I think the court has the opportunity. And you look at the trial transcript, the government's objecting when it's appropriate. And the other thing that's fascinating about this, the trial's almost over. If you look at it, the bulk of the witnesses have testified. The bulk of the evidence is in. Why not let him just finish what he's done? I think the notion that there was a timeliness issue rings hollow, too, because she's already implemented those procedures, right? She's already limited his cross. I don't know what is helping by taking that action then. And it's almost like 4B evidence. Let's say the judge allows that evidence in for three days. And then on the third day says, you know what? I changed my mind. No more 4B evidence. I think that's alarming because there's a no man's land there where you need to stick to your ruling early on as a trial judge, and otherwise you're creating more errors. I think the other issue I'd like to address is the plain error issue. And you heard Mr. Casey talk about, I think repeatedly, everybody knew. He said that term. How can it be plain error if everybody knew the issue? The whole point of objecting, right, is to allow the trial court to correct mistakes. And that's why people are penalized for plain error, because they didn't object. The judge didn't have a chance to correct that mistake. Here you have the judge consistently reevaluating her conduct in front of the jury, which is another issue altogether where she's sort of giving him tips and things, and I think those were well-intentioned by the judge. But if I were a juror, I'd think, gosh, she's nothing more than a misfit. But going back to the plain error issue, I just don't see how the judge wasn't on notice of it, and what more good Mr. Lessing coming up and saying, your Honor, I object. And in any event, I don't think that because it's a right to counsel, it's a right that's viewable through that plain error lens. No one disputes that it's a structural error, uniquely structural, under the United States Supreme Court case law and this Court's case law. And so for all those reasons, we'd say the only remedy is a new trial. There's no other questions. Thank you for your time. Very well. Thank you, counsel. Case has been well argued, and it is submitted. We'll issue a decision as soon as we can.